DENNIS, Judge.
On November 3, 1967 an automobile driven by Wilson Q. McMullan collided with a vehicle operated by Bruce P. Thompson at the intersection of Ockley Drive and An-niston Street in the City of Shreveport. Bruce P. Thompson, an 18 year old residing with his father, was driving an automobile belonging to his father’s employer. James McMullan, 7 year old son of Wilson Q. McMullan, was riding with his father. Following the accident young McMullan had several epileptic convulsions over a period of about four years and died on December 27, 1971.
Two law suits were filed because of these events. Wilson Q. McMullan sued E. C. Thompson, Jr., individually and as administrator of the estate of his son, Bruce P. Thompson, and his insurer, The Travelers Insurance Company, to recover for McMullan’s own property loss and personal injuries and for those sustained by James McMullan. Travelers and Thompson reconvened against Wilson Q. Mc-Mullan claiming he was liable in contribution for one-half of any award made to James McMullan. After the death of James McMullan, a supplemental and amended petition was filed by Wilson Q. McMullan and Anna McGowan McMullan, his parents, to recover damages for his wrongful death. Travelers again reconvened against Wilson Q. McMullan for contribution.
Motors Securities Company, Inc., owner of the car driven by Bruce P. Thompson, and its insurer, American Employers’ Insurance Company, sued McMullan to recover for damage to the vehicle. Later, by amended petition, E. C. Thompson, Jr., joined as co-plaintiff asserting a claim against McMullan for personal injuries to his son, Bruce P. Thompson. McMullan filed a third party petition against Thompson and Travelers for contribution of one-half of any amounts awarded.
After the cases were consolidated and tried, the trial judge, without written reasons, rendered judgment rejecting all demands of the McMullans. In the other suit judgment was rendered for the plaintiffs against Wilson McMullan as follows: For American Employers in the sum of $738; for Motors Securities Company, Inc. in the sum of $50; and for E. C. Thompson in the sum of $56. Wilson and Anna McGowan McMullan appealed from the judgments in both cases.
Ockley Drive is a two-lane thoroughfare approximately 35 feet in width running east and west, and Anniston Street is a two-lane street about 25 feet wide extending north and south. An electric semaphore light is stationed over the intersection for the purpose of regulating two-way traffic on both streets.
Wilson McMullan testified that after dark on the evening of the accident he was driving his 1962 Chevrolet station wagon east on Ockley at a speed of 30 to 35 miles per hour. As he approached the intersection of Ockley and Anniston, the traffic light facing him was green. When he got to the pedestrian cross walk at the intersection the light changed to yellow. McMullan stated that because of the position of his vehicle at the time the light changed he could not have stopped short of the intersection. He said his car would have stopped in the middle of the intersection had he tried. Therefore, he did not apply his brakes but attempted to drive across Anniston. As he reached the middle of the intersection he noticed to his left *905 an automobile coming toward his car in the center of Anniston Street. McMullan accelerated and swerved to his right but the vehicles collided in the southeast quadrant of the intersection.
Bruce P. Thompson testified that before the accident he had been traveling south on Anniston in a 1965 Chevrolet owned by his father’s employer. He was on his way to his girl friend’s house. He stopped at a stop sign one block away from the intersection and observed that the traffic light at Ockley was red. Trees canopied Anniston Street covering his approach. After making the stop, he accelerated to 25 miles per hour but then slowed in order to reach the intersection at the same time the light changed. Thompson testified that he saw the reflection of the lights on the Ockley side of the traffic signal and gauged his approach so that he entered the intersection at a speed of about 15 miles per hour just after the light changed to green on his side. According to Thompson, his car ran broadside into the Mc-Mullan vehicle in the southbound lane of Anniston Street. He admitted that he did not look to his left or right before entering the intersection and that he saw the other vehicle only an instant before the impact.
The undisputed physical evidence indicates that McMullan’s version of where the collision occurred is the more correct one. The drivers agreed that both vehicles came to rest in or near Anniston some distance east of the intersection. The photographs of the vehicles taken after the accident show that the McMullan vehicle sustained heavy damage at the front door on the driver’s side and that the Thompson vehicle was damaged severely by an oblique blow which occurred at the extreme right end of the front bumper. The McMullan vehicle was declared a total loss and sold for salvage.
Considering the testimony of the drivers, which differed only as to the point of impact, as well as the physical evidence, we find that Thompson entered the intersection at a rate of speed substantially greater than 15 miles per hour almost simultaneously with the change of signals, swerved to his left, collided at an angle with the McMullan vehicle in the southeast quarter of the intersection, and continued east in Anniston before coming to a stop. We also conclude that the signal changed to yellow on McMullan’s side when he was too near to safely stop his vehicle short of the intersection.
The law is well settled that where traffic is controlled by an electric semaphore light a motorist is guilty of negligence if he proceeds into an intersection after a red light turns to green without allowing sufficient time for those in the intersection to clear it. Harris v. State Farm Mutual Automobile Insurance Company, 287 So.2d 560 (La.App., 2d Cir. 1974); Martin v. Slocum, 147 So.2d 454 (La.App., 2d Cir. 1962); Schindler v. Gage, 59 So.2d 215 (Orl.La.App., 1952); Blue Ribbon Cleaners v. Aetna Casualty & Surety Company, 125 So.2d 613 (La.App., 4th Cir. 1961); Potts v. United States Fidelity & Guaranty Company, 135 So.2d 77 (La. App., 2d Cir. 1961).
The duty of a motorist who is faced with a traffic light which has changed to yellow as he approaches an intersection has been fully considered and delineated by this court. In Harris v. State Farm Mutual Automobile Insurance Company, 287 So.2d 560 (La.App., 2d Cir. 1973) we stated:
“ * * * While it is true that Louisiana Revised Statutes 32:232(2) (a) [relating to an amber light] provides that, ‘Vehicular traffic facing the signal is thereby warned that the red or “Stop” signal will be exhibited immediately thereafter and such vehicular traffic shall not enter or be crossing the intersection when the red or “Stop” signal is exhibited’, this provision must be interpreted with the emphasis on ‘warned’. The provision that ‘such vehicular traffic shall not enter or be crossing the in *906 tersection when the red or “Stop” signal is exhibited’ means that the entrance should not be made on a caution light if by reasonable diligence it can be avoided. If the driver is in the process of entering as the light changes he has pre-empt-ed the intersection and is committed to move on in order to clear the passage for traffic travelling perpendicular to him. To say that a driver is negligent under all circumstances would be unreasonable and inviting accidents rather than preventing them. . . . ” [287 So.2d 560, 563]
Applying these principles to the facts as found it is clear that Thompson failed to make proper observation of traffic on Ockley Drive before entering thereon, and, as a result, did not observe the approach of the McMullan car which could and should have been seen. Moreover, we find nothing in the evidence to indicate any negligence on the part of McMullan. At the time the light changed to yellow on his side he was so near the intersection that entrance on a caution light could not be avoided by reasonable diligence. It was reasonable for him to have concluded that an attempt to stop his vehicle at this time would have resulted in it coming to rest in the intersection. There was no evidence that he was exceeding the speed limit or otherwise careless as he approached the intersection. The testimony and physical evidence indicate that McMullan saw the oncoming Thompson car as soon as he should have and took the only reasonable measure available to him in an effort to avoid the accident.
The instant case is distinguishable on its facts from Youngblood v. Robison, 239 La. 338, 118 So.2d 431 (1960), and other similar cases cited by the appellees. In Young-blood a driver who had entered an intersection in a normal manner at a reasonable interval after receiving a green signal was exonerated from negligence in his failure to observe an oncoming motorist who with reasonable diligence could have avoided entrance to the intersection on a yellow or red light. In other words, the driver with the green light in that case did not enter the intersection as Thompson did. Thompson was negligent because he gauged the light and entered the intersection abruptly after receiving a green signal and without allowing sufficient time for other motorists, who could not reasonably avoid entrance on a yellow caution light, to clear the intersection.
Under the circumstances we are required to reverse the judgments rejecting the demands of Wilson and Anna McGowan McMullan. Instead they are entitled to decrees in their favor in both suits. Several issues relating to quantum remain to be resolved in the McMullans’ suit against E. C. Thompson and Travelers. The more serious questions, of course, are whether the death of James Q. McMullan or his epilepsy resulted from the accident, and, if so, the consequent amount of damages to be awarded.
Before the accident young McMullan had never had a head injury or a convulsion. His most serious illnesses had been chicken pox and viral pneumonia. He had been hyperactive and experienced some .difficulty with his school work in the first grade. Otherwise he had been a normal, healthy child.
Following the accident, James McMullan was taken to the Schumpert Hospital emergency room where he was attended by Dr. James W. Tucker. The physician testified that the boy had sustained a laceration over the left eye which he repaired with ten sutures. The patient was given a tetanus shot and the stitches were removed six days later. Three months later he was brought back by his mother because he repeatedly complained of headaches, from which he had not suffered before the accident. Dr. Tucker referred him to Dr. Charles Armistead for an electroencephalograph test. Dr. Tucker did not see young McMullan again, although he later received a report from Dr. Armistead.
*907 Dr. Armistead’s written report, dated April 8, 1968, was introduced as an exhibit. In part, it provides :
“IMPRESSION:
“Abnormal electrogram showing an infrequent slow spike discharge picked up best by the left temporal to the left parietal linkage. This is rather low in voltage but tends to suggest a possible focal atrophic lesion in this region. A repeat for sleep study should be done.”
During his sleep on June 26, 1968 James McMullan had his first epileptic convulsion or seizure. When he was discovered by his family his teeth were clenched, his body was rigid, his face was gray and he was drooling a small amount of vomitus. He was taken to the Fairfield Hospital where he was seen by Dr. James H. Shipp, a specialist in neurology and electroencephalography. He had aspirated some of his vomitus and was suffering with throat and chest pains. The doctor determined upon examination that the child was in a postconvulsive state. He stayed in the hospital 3 or 4 days, during which time Dr. Shipp ran the first of a series of electroencephalograph tests and started him on a drug known as Dilantin to control convulsions.
According to Dr. Shipp “electrical spikes”, or sharp pointed graph lines, were recorded during the first EEG test and emanated from the left temporal area of James’ brain. Lower voltage or an excessive “slowing” was also recorded in this area. Dr. Shipp testified that these findings were evidence of a convulsive disorder and abnormal in a child of his age. Subsequent EEG tests conducted by the doctor produced somewhat different results. On October 24, 1968 Dr. Shipp testified that a slight improvement was indicated. Then, on November 4, 1969 the record of the test showed a great deal of improvement over the previous ones. In his opinion the distinct improvement in these test results in the short interval involved indicated that the abnormality was due to injury. Apparently, the doctor was of the opinion that a non-traumatic brain disorder probably would not improve as rapidly as did young McMullan’s abnormality. A fourth EEG test run by Dr. Shipp on June 25, 1971, showed the same convulsive focus in the deep temporal area as was present in the first test. But the doctor was not asked to explain the significance of this test.
On August 15, 1970 James McMullan had another seizure. He had been asleep in the night and awakened his parents with the noise of his vomiting. He was again taken to a hospital for emergency treatment by Dr. Shipp. He had aspirated a small amount of vomitus or an excess amount of mucus. He also suffered from congestion of the lungs, but he responded to the treatment with good recovery.
On December 27, 1971 young McMullan went to bed at about 10 o’clock in the eve-ing after eating a piece of pumpkin pie. Later in the night he was discovered by his family in his bed with black and blue splotches on the skin of his arms and legs. His mouth was full of vomitus containing the pumpkin pie. His mother, who was a registered nurse, gave him artificial respiration, and his father massaged his limbs, which caused the splotches to disappear. In response to emergency calls policemen, firemen and ambulance attendants soon arrived. Efforts to revive James’ respiration were continued by his mother, a policeman, and firemen. But they were never able to establish a clear airway down his throat. He was taken to the emergency room at Schumpert Hospital by ambulance.
According to Dr. Shipp, who saw James at the hospital, he was dead upon arrival. The doctor concluded from his examination that James had aspirated a massive amount of vomitus into his lungs and suffocated. Dr. Shipp testified the vomitus was evident on his face and neck, in his hair, in his ears, and his mouth and throat were full of the material. Before pro *908 nouncing him dead the doctor performed a complete neurological examination including his heart, blood pressure, optic nerve, and blood vessel circulation in the back of his eyes.
Dr. Shipp expressed the opinion, based on the medical history provided by the parents, the physical examinations, the EEG tests, and his treatment of James over a period of about four years, that there was a reasonable medical certainty that his death was caused by epilepsy, or a convulsive disorder, which resulted from force applied to his brain in the automobile accident in which he was involved on November 3, 1967. The doctor testified that the time which elapsed between the accident and James’ first convulsion on June 26, 1968 was not significant because in some patients a delay of as much as 20 years had occurred between brain injury and the first convulsion.
Defendants-appellees contend that Dr. Shipp’s testimony should be discounted because of prior inconsistent statements. In a written report dated October 3, 1969 addressed to the McMullans’ attorney he expressed his inability to either establish or eliminate a direct causal relationship between the auto accident and the convulsive disorder. However, despite some early confusion as to dates in his testimony, Dr. Shipp ultimately and convincingly explained that he did not decide definitely that the accident caused the epilepsy until after reviewing the results of the third EEG test performed on November 4, 1969. Dr. Shipp had testified before being confronted with his written report that it was this particular EEG test, with its record of marked improvement, that indicated the convulsive disorder was produced by trauma. It is also contended the doctor’s testimony conflicted with the death certificate which he signed. Under the item relating to the cause of death Dr. Shipp had first written “probable convulsive disorder”, and in the second part of this item he had entered “possible acute viral in’fec.” At the trial he explained that in his opinion death was caused by convulsion, not viral infection, but that he entered the latter as a possible, not probable, cause for statistical purposes in response to the state health department’s desire to have every possibility of causation of death mentioned on death certificates. We find no inconsistency between the doctor’s testimony and these prior extra-judicial statements.
Dr. Paul D. Ware, a psychiatrist and neurologist, examined James McMullan at the request of the attorney for Thompson and Travelers on May 8, 1970. Dr. Ware was given a history by James’ mother of the automobile accident, the obvious injuries suffered therein, the subsequent headaches, the convulsive episode on June 26, 1968, and he was also provided a history from Dr. Shipp. During the examination Dr. Ware stated that young McMullan exhibited some hyperactivity and immaturity. The results of an EEG test performed at the time were mildly abnormal, according to the doctor. His findings suggested some mild cordical irritation in the left parietal and left temporal region of the brain. But he could not diagnose a convulsive disorder from these findings alone. From the medical history, however, he concluded that James did have a convulsive disorder, but he could not say definitely whether it had been caused by trauma. He testified that the automobile accident could have been a causal or aggravating factor but that he did not have definite proof of it.
During his testimony Dr. Ware was asked to examine the results from the EEG tests run by Dr. Shipp. After doing so, Dr. Ware testified that the additional data “is more suggestive that there may have been damage sustained at the time of the accident [but] I don’t think you can say this with absolute medical certainty.” Tr. pp. 242, 243. He stated that in order to attain “absolute medical certainty” as to the cause of the convulsive disorder, it would be necessary to have EEG tests performed before the accident to compare with those run afterwards.
*909 In response to a hypothetical question outlining the salient facts which occurred on the night of James’ death, Dr. Ware testified that in his opinion there were three possible causes of the child’s death, viz., a Waterhouse-Friderichsen syndrome produced by overwhelming infection, an upset stomach, and an epileptic convulsion. However, he stated that the previous convulsions made death produced by a seizure disorder “a very definite possibility”. Tr. p. 250. He also testified that convulsions tend to occur more during sleep, and he stated that there was a difference in his mind between “absolute medical certainty” and “reasonable medical certainty”. But he was not asked to elaborate on these matters or to relate them to the case of young McMullan.
We find no reason to disbelieve any of the testimony relating to the issue of causation of death. Dr. Shipp’s testimony, however, should be accorded greater weight than the other evidence. He was the only physician testifying at the trial who had actually treated James McMullan. Furthermore, he had treated him specifically for the convulsive disorder involved over a period of four years and had attended him immediately after seizures twice before his death. Under these circumstances he was clearly in the best position to render an opinion on whether the accident caused James’ epilepsy and his death. Moreover, Dr. Ware’s testimony as to these issues does not seriously controvert Dr. Shipp’s opinion that both James’ death and his epilepsy resulted from the mishap. In essence, Dr. Ware testified that from his own single examination and the EEG test records in evidence he could not state “with absolute medical certainty” the accident caused the convulsive disorder, and, based on this data and hypothetical facts given by defendants-appellees’ attorney, he testified that it was “a very definite possibility” ' the convulsive disorder caused James McMullan’s death. From the doctors’ testimony and all other evidence we conclude that it is more probable than not that the head injuries sustained by James McMullan in the automobile accident on November 3, 1967 caused him to have epilepsy, or a convulsive disorder, which in turn ultimately caused his death during a seizure on December 27, 1971.
James McMullan was seven years old when the accident occurred and eleven when he died. During the four year interval he suffered two epileptic convulsions before the final; fatal one. Both previous seizures casued James pain, anxiety and hospitalization. Except for brief periods in connection with the numerous EEG tests he regularly received antiseizure medication. Nevertheless, due to the convulsions he suffered despite this medicine, he must have been under constant apprehension during much of the four years he lived with epilepsy.
The McMullans had three daughters, but James was their only surviving son. Two other sons had been born but both died before James’ birth. One died at an early age of leukemia, and the other succumbed in a crib death in infancy. James was the last born child of the McMullans and was understandably close to his parents. His mother had suffered severe anxiety because of her other sons’ deaths, and had sought medical advice for this even before James’ death.
We find that Wilson and Anna McGowan McMullan are each entitled to recover $30,000 for the damages which they sustained through the wrongful death of James McMullan. In deciding upon this award we have considered, without being governed by, the following cases. Bailes v. Casualty Reciprocal Exchange, 279 So.2d 255 (La.App., 2d Cir. 1973); Poston v. Firemen’s Insurance Company of Newark, N.J., 256 So.2d 700 (La.App., 2d Cir. 1972); Parks v. Liberty Mutual Insurance Company, 291 So.2d 505 (La.App., 2d Cir. 1974); Jackson v. Jones, 288 So.2d 432 (La.App., 4th Cir. 1974); Lopitz v. Louisiana Department of Highways, 268 So.2d 269 (La.App., 4th Cir. 1972); Dupuy v. *910 Pierce, 285 So.2d 321 (La.App., 3d Cir. 1973); Hurston v. Dufour, 292 So.2d 733 (La.App., 1st Cir. 1974) and Bascle v. Champagne, 303 So.2d 848 (La.App., 1st Cir. 1974).
We further determine that Wilson and Anna McGowan McMullan are entitled to recover $10,000 as survivors to the right of James McMullan to recover damages caused by the accident. Although there does not appear to be any truly similar case reported, we have considered as somewhat helpful the following. Heider v. Employers Mutual Liability Insurance Company of Wisconsin, 231 So.2d 438 (La.App., 4th Cir. 1970) and Raley v. Liberty Mutual Insurance Company, 242 So.2d 378 (La. App., 2d Cir. 1970.)
In the accident Wilson McMullan received a cut over his left eyelid, cuts on the left side of his face and a bruised left hip. He was unable to walk for several days and missed 3 days’ work. On the night of the accident McMullan was taken by ambulance to the Schumpert Hospital, where he was treated by Dr. Tucker, who sutured his eyelid and x-rayed his hip. No additional treatment was required except for removal of the stitches two weeks later and for treatment of a scar on his nose 1% months after the accident. We will award Wilson Q. McMullan $1,000 for his injuries and $87 for medical expenses resulting from the accident.
Additionally, Wilson Q. McMullan is entitled to recover $2,222.64 for medical and funeral expenses incurred on behalf of James, and $975 for the destruction of his automobile.
For the reasons assigned, the decisions appealed from are reversed and the following judgments are rendered:

In No. 12,557

It is Ordered, Adjudged and Decreed that there be judgment herein in favor of Wilson Q. McMullan and against The Travelers Insurance Company and E. C. Thompson, Jr., in solido, in the amount of $39,284.64, with legal interest thereon from date of judicial demand until paid.
It is Further Ordered, Adjudged and Decreed that there be judgment herein in favor of Anna McGowan McMullan and against The Travelers Insurance Company and E. C. Thompson, Jr., in solido, in the amount of $35,000, with legal interest thereon from date of judicial demand until paid.
It is Further Ordered, Adjudged and Decreed that all costs of these proceedings shall be assessed to The Travelers Insurance Company and E. G. Thompson, Jr.

In No. 12,558

It is Ordered, Adjudged and Decreed that there be judgment herein in favor of Wilson Q. McMullan and against American Employers Insurance Company, Motors Securities Company, Inc., and E. C. Thompson, Jr., rejecting their demands and assessing all costs of this proceeding against them.
Reversed and rendered.