SEXTON, Judge.
Plaintiff-appellant, Lillian C. Dale, instituted suit against Reginald L. Carroll and his insurer, Bankers Multiple Line Insurance Company, to recover damages sustained in an automobile accident which occurred on October 5, 1984, in Ouachita Parish, Louisiana. The trial court found both drivers fifty percent at fault in causing the accident and rendered judgment in favor of the plaintiff and against the defendants Carroll and Bankers Multiple Line Insurance Company, in solido, in the sum of $23,488.03. From this judgment, the plaintiff devolutively appeals. The defendant and his insurer answer. We amend, and as amended, affirm.
The accident occurred on October 5, 1984, at about 9:00 a.m. at the intersection of Winnsboro Road (also known as Louisiana Highway 15) and Berg Jones Lane (now renamed Parkview) in Monroe, Louisiana. Winnsboro Road is a four-lane thoroughfare with two lanes of travel generally running east and west. Berg Jones Lane is a two-lane street with one lane for travel generally running north and south. Traffic at the intersection is controlled by overhead light signals which alternate from green to yellow to red and from red to green. On the northeast corner of the intersection, there is a grocery supermarket with a large parking lot. There are no obstructions to vision at any of the four corners of the intersection.
Immediately prior to the accident, the plaintiff, then age 68, had been traveling in a northerly direction on Berg Jones Lane on her way to work at The Fair Department Store. At trial, she testified that she had stopped at a traffic light at the intersection of Berg Jones Lane and Winnsboro Road. When her light turned green, she entered the intersection and was broadsided by the defendant’s car at approximately the driver’s door on the left side of her car. Ms. Dale testified that she never saw Carroll in the intersection prior to their collision. However, Ms. Dale testified that she did see other cars southbound on Berg Jones Lane almost collide with Mr. Carroll. She said these cars also entered the intersection when the light changed to green. Additionally, while plaintiff’s testimony is a bit confusing on the subject, we understand the import of it to be that the defendant was traveling in the inside eastbound lane. *772 No other witness testified with respect to precisely which lane of the two eastbound lanes Mr. Carroll was traveling in.
, Reginald Carroll, the defendant, testified that he was traveling east at about 30 to 35 miles per hour on Winnsboro Road. He stated that when he was “very close” (an unspecified distance) to the intersection, he saw his green light change to yellow, and “when it changed over to yellow I thought I could beat it and I ran the yellow light.” He testified further that he kept going through the yellow light because “I knew if I had stopped, I would have stopped under the light because I was close to it when it hit — when it come to yellow.” He admitted being somewhat late for work, his intended destination. He was issued a citation for running a red light, which he paid.
Two occupants of a vehicle which was sitting behind the plaintiff at the traffic light testified. Ms. Belinda Ross and Sadie Lee Green both testified that the plaintiff did not start into the intersection until the light facing Berg Jones Lane turned green. However, neither of them saw the Carroll car until the collision, and both testified that the collision occurred before they had begun to move forward. Ms. Green further testified that Mrs. Dale’s car came to rest on the north side of Winnsboro Road in front of the grocery store.
Officer Wayne Rhodes, the investigating officer, testified that this accident was the very first he investigated after becoming employed with the Monroe Police Department. He confessed that he had no independent recollection of any details other than the general nature and location of damage to the vehicles. During the trial, he referred to his written accident report; however, his report was not filed in evidence.
Regarding the issue of damages, the evidence reveals the plaintiff was 68 years of age at the time of the accident. She was observed immediately after the accident with fragments of glass in her hair and on her face, and with some blood on her ear and neck. She went to the emergency room at St. Francis Medical Center in Monroe, where her chief complaints were pain in her left shoulder, neck, chest and lower back, along with weakness. She was found to have very small, superficial cuts on her ear and neck and the doctor was concerned that her left eye contained glass fragments. X-rays of her shoulder and chest were negative. She was given pain medication and muscle relaxants. On October 8th, x-rays of her lumbar spine showed hypertrophic degenerative changes.
On October 9th, she consulted an ophthalmologist who found no glass in her eye and no traumatic damage.
On October 12th, Mrs. Dale visited her regular doctor, Dr. Claude Smith, for a follow-up examination. No report or deposition of Dr. Smith was filed in evidence. Mrs. Dale did testify, however, that Dr. Smith eventually told her she had arthritis in her knees and hands. Dr. Smith referred Mrs. Dale to Dr. C.R. Hand, an orthopedic surgeon in Monroe.
Dr. Hand first saw Mrs. Dale on November 13,1984, approximately six weeks after the accident. Mrs. Dale told Dr. Hand that she had injured her left knee in the car accident and that she continued to have pain in the knee with some questionable swelling. She stated that she had pain when she tried to fully extend the joint. Dr. Hand’s examination of her left knee joint revealed minimal effusion or swelling, along with marked anterior medial and medial joint line tenderness. He noted a full range of motion and no evidence of crepitus or misalignment of the kneecap. Dr. Hand recommended arthroscopic exploration.
On November 27, 1984, Mrs. Dale entered Glenwood Medical Center in West Monroe to undergo arthroscopic surgery. Dr. Hand found a “little fibrillation” of the cartilage behind the kneecap which he opined was not likely to be related to the accident and a tear in the left outside cartilage, which he felt could have been caused by the accident. He repaired the tom cartilage and released Mrs. Dale from the hospital on November 29th. Dr. Hand testified that by December 19th Mrs. Dale had full range of motion and was lifting twenty *773 pounds with her leg. Thus, she was released on January 8, 1985.
On April 19th, Mrs. Dale returned to Dr. Hand complaining of pain in her left knee and right foot. Dr. Hand noted that she had a little swelling in the knee at that time, however, he did not find anything wrong with her foot. He prescribed Na-prosyn, an arthritis medication, and told her to return in a month.
On May 28, 1985, Mrs. Dale returned to Dr. Hand who found that she had some bursitis in her knee. Dr. Hand explained that the bursa is outside the knee joint, and he expressed his opinion that, while bursitis could possibly result from accidental injury, plaintiffs inflammation most probably did not relate to the accident since it did not show up until seven months thereafter.
In the meantime, plaintiff’s attorney had made an appointment for her to be evaluated by Dr. Baer Rambach, an orthopedic surgeon in Shreveport.[1] Dr. Rambach first examined her on May 14, 1985, seven months after the accident. At this time, Mrs. Dale reported an injury resulting from the accident to her right ring finger, in addition to her shoulder, neck, back, left knee and right foot.
Dr. Rambach found bunion deformity and arthritis in her right foot but nothing attributable to the accident. He also found inflammation of the tendon in the finger which could have been caused solely by inflammatory changes or by trauma or aggravated by trauma, resulting in a “trigger” finger. Dr. Rambach explained that “triggering” means that the tendon would not easily release to allow the finger to straighten and would cause pain when manually straightened.
Following a physical examination and x-ray, Dr. Rambach suspected deterioration of the surface of cartilage under the kneecap and some changes or defects to the femoral condyle which articulates with the knee joint. He noted that she did have some arthritic changes in her knee joint which “undoubtedly will continue to have difficulty of various degrees of severity.” He recommended arthroscopic exploration.
On June 20, 1985, Dr. Rambach performed surgery for “the trigger finger release.” Mrs. Dale later returned complaining of her knee and underwent additional arthroscopic surgery in September by Dr. Rambach, who “shaved” the patella, de-brided the femoral condile, did a “partial lateral retinacular release” and a “partial synovecomy.” Dr. Rambach attributed these conditions at least in part to the accident, either as direct trauma as claimed by Mrs. Dale, or as a result of traumatic aggravation of pre-existing arthritic or degenerative conditions.
Ms. Dorothy Dupree, a co-worker of the plaintiff, testified that she had worked with Mrs. Dale since August, 1977 at The Fair Department Store. Both Mrs. Dale and Ms. Dupree testified that Mrs. Dale was always prompt, had no physical impairments or limitations, earned a promotion to department head, never missed work, and climbed and bent and moved merchandise in a wholly, unrestricted manner despite her advancing age. However, they stated that since the accident she has encountered substantial difficulty in standing, walking and doing the physical aspects of her work (such as bending, climbing or reaching to upper shelves while moving merchandise). Moreover, they testified that she now requires frequent rest periods and assistance from fellow workers.
Mrs. Dale denied that she had any difficulty with pain or arthritic symptoms prior to the accident, although she admitted she was previously given blood pressure and arthritis medication by Dr. Smith. Also, Dr. Hand had treated her for ankle complaints several months before the accident which he thought was a combination of a contusion and arthritis.
Mrs. Dale, a retired school employee, had been working as a saleslady in The Fair Department Store for several years. An exhibit from her employer indicated that she normally worked seven hours per day at $4.40 per hour and that she missed 81 *774 days between June 20th and November 4, 1985. Apparently, she also missed some time during and following her surgery by Dr. Hand in November through December, 1984; however, that period is not covered in the employer’s exhibit.
In its lengthy, well-written reasons for judgment, the trial court stated:
On the evidence adduced, the Court perceives this accident to be a typical, almost classic example of equal negligence. If either driver had been more attentive and less insistent upon supposed right-of-way, the collision would not have occurred. The Court finds both drivers at fault in the proportion of 50% each.
Moreover, after a careful examination of the testimony relating to damages, the trial court concluded,
The foregoing synopsis of the evidence reveals a rather typical case of a person who paid only cursory attention to physical ailments during advancing age, whose consciousness was then focused on her health by a dramatic event — in this case, the accident. Plaintiff’s description while testifying was forceful and rather obviously melodramatic in tone, gesture and choice of words while vocally representing a stoic approach. The medical evidence is clear that she did in fact have significant degenerative changes in joints and spine before the accident, that she had some manifestations thereof and some treatment therefor.
Moreover, while Dr. Rambach accepted her history at face value and expressed the well-known possibility of traumatic origin of most of the knee findings and the finger condition, careful analysis of the other medical evidence and the development of complaints casts serious doubts on the causation issue. Plaintiff is certainly not an intentional malingerer, nor does the Court question her obvious sincerity in her present subjective conviction that all of her subsequent troubles resulted from the accident. The external evidence simply does not fully support such a conclusion.
[[Image here]]
Plaintiff was undoubtedly destined to have knee problems (and in other joints) progressing with the passing of time. Any person aware of advancing years knows that the body simply loses steadily in its bout with time; and the joints are among the first areas to manifest this state — with or without an objective medical diagnosis. One at that stage of life has only to perform simple household tasks, weeding the garden, stooping or bending or stretching in routine activities to experience the effects of these changes.
Thus, the trial court determined that the total general damages amounted to $39,-000.00, and the special damage award was $7,976.06.
Having determined that both of the drivers were fifty percent at fault in the cause of the accident, the trial court thus rendered judgment against the defendants, Reginald L. Carroll and Bankers Multiple Line Insurance Company, in solido, in the amount of $23,488.03.
On appeal, appellant asserts two assignments of error. Appellant first asserts that the trial court erred in finding the plaintiff-appellant fifty percent at fault in this accident. Secondly, appellant argues that the trial court indirectly reduced certain of the plaintiff’s special damages and also that there were certain injuries sustained in the accident for which the trial court did not make an award. In direct contrast, the defendants in answering the appeal contend that the defendant Carroll was not at fault, or alternatively, that the extent of his fault was less than that assigned by the trial court. They conclude by arguing that the damages assessed by the trial court were excessive.
Appellant argues that common sense and the physical facts demonstrate that the defendant was not in the intersection when plaintiff proceeded forward on a green light. They note that the plaintiff’s duty as defined by Correge v. Webb, 284 So.2d 355 (La.App. 4th Cir.1973), is only to make a general observation of the intersection and to allow traffic already in the inter *775 section at the time of the light change to complete the crossing thus begun.
Correge v. Webb is factually similar to the instant case. In Correge, the dispute was between a southbound vehicle and an eastbound vehicle. The southbound driver contended that she entered the intersection on a green or a yellow light (rather than a red light), as found by the trial court. The southbound driver’s appellate contention was that even if she had been negligent in entering the intersection, the eastbound vehicle, which was stopped for a red light, had a duty upon the light turning green to allow sufficient time for a vehicle which entered the intersection on a yellow light to clear the intersection. The Correge court rejected this contention since it determined that the southbound vehicle was not in the intersection at the time the light changed.
The Correge court noted that LSA-R.S. 32:232(2)(a)[2] allows a motorist under those circumstances to complete the crossing of the intersection only if the crossing was legally begun. The court stated that at *776 the stated speed of the southbound driver (30-35 miles per hour), if she had entered the intersection legally, she necessarily would have cleared the intersection before the other vehicle (starting when the light turned green for the eastbound traffic) could have reached the point of impact.
On rehearing, the Correge court clearly stated the duty of a vehicle entering an intersection from a stopped position after the traffic light turns green.
The purpose of the yellow warning signal is not only to provide a warning that the light is about to change to red, but also to provide a period of time for traffic entering the intersection just as or just after the light turns yellow to clear the intersection before the green light flashes for opposing traffic. If the burden is placed on the motorist in whose favor the light turns green to keep a lookout for traffic which blatantly disregarded the yellow warning signal, then the function of the yellow caution light will be frustrated. Traffic lights, instead of serving to facilitate the movement of traffic, would then serve to deter its movement.
Considering these factors and the holding of the Bourgeois [v. Francois, 245 La. 875, 161 So.2d 750 (1964)] case, we thus state Webb’s duty under the facts and circumstances of the present case: When the light turned green in Webb's favor, he was obliged to make a general observation of the intersection and to allow traffic already in the intersection at the time of the light change to complete the crossing thus begun. He was not obliged to look further down the cross street for traffic then approaching but not yet within the intersection at the time of the light change.
Inasmuch as the Black vehicle had not yet entered into the intersection when the light changed to green in Webb’s favor, Webb owed no duty to Mrs. Black or to her passenger to delay his forward motion or to anticipate that Mrs. Black would disregard first the yellow and then the red signal.
[Footnotes omitted.]
The instant defendant attempts to distinguish this case from the Correge case. In Correge, the expert testimony convinced the court that one of the motorists involved in the intersectional collision had entered the intersection on a red light. Appellee points out that in that case a detailed plat as well as testimony concerning the duration of the various traffic signals was introduced. The appellee further notes in the instant case that the plaintiff failed to introduce any technical evidence concerning the time sequence of the traffic light phase from green to yellow to red.
As a general rule, a driver approaching an intersection on a green light or the beginning of a yellow light does so legally. Cumis Insurance Society, Inc. v. Christidis, 418 So.2d 730 (La.App. 4th Cir.1982).
In McMullan v. Travelers Insurance Company, 311 So.2d 902 (La.App. 2d Cir.1975), this court reiterated the duty of a motorist who is faced with a yellow traffic light which has changed to yellow as he approaches an intersection. We stated that entrance should not be made into an intersection on a yellow light if by reasonable diligence it can be avoided. However, we noted that if a driver is in the process of entering as the light changes to yellow, he has preempted the intersection and is committed to move on in order to clear the passage for traffic traveling perpendicular to him.[3]
*777 Our initial problem upon review is that the trial judge did not specifically determine whether Carroll was already in the intersection at the time Dale’s light changed from red to green. Instead, the trial judge stated that “the Court is bound to conclude that he was very near if not entering the intersection when plaintiff started forward.” The judge stated further that “although Carroll may have actually entered the intersection at the instant his light changed from yellow to red, he was clearly sufficiently close to making stopping difficult if not hazardous.”
However, there are certain known factors which assist us in evaluating the determination of the trial court. The two witnesses behind Dale testified that the light was green when Dale entered the intersection. There was no other evidence to the contrary. Also, the damage to Dale’s car impacted as far back as the driver’s door on the left side of her car. Additionally, the evidence shows that the defendant Carroll’s car was in the inside of the two eastbound lanes.
In sum, the evidence reveals that plaintiff started on the green light, that Mr. Carroll was in the inside lane and then struck the plaintiff’s automobile in the vicinity of her driver’s door. This evidence indicates that the defendant’s vehicle, traveling much more rapidly than that of the plaintiff accelerating from a stopped position, did not enter the intersection on either a green or a yellow light. We determine that any specific or implicit finding of the trial judge to the contrary is clearly wrong. Moreover, it seems likely that if Carroll entered the intersection on a yellow light traveling between 30 and 35 miles per hour, he would have cleared the two-lane Berg Jones Lane upon which the plaintiff was traveling—or at minimum would have been struck by her, rather than vice-versa.
The trial judge emphasized that regardless of whether Carroll entered the intersection at the instant his light changed from yellow to red, Carroll was sufficiently close to the intersection so that Dale had a duty to observe him before entering the intersection.
Considering the factors we have just enunciated, we have serious doubt that the defendant was as close to the intersection as the trial judge observed. The location of the damage to the vehicles indicates that when the accident occurred, Mrs. Dale had crossed one of the four lanes of the Winns-boro Road and was just beginning to exit the second lane. The defendant had likewise crossed one lane of the two-lane Berg Jones Lane when he hit the plaintiff broadside. Thus, both parties were about the same distance into the intersection. However, since the defendant was obviously traveling more rapidly, he must have come from a further distance.
The foregoing observations aside, Dale, as one entering an intersection on a green light, does not have a duty to observe traffic not yet in the intersection. As per Correge, Dale only had a duty to allow traffic already in the intersection at the time of the light change to complete the crossing. Dale was not obliged further to look down the cross street for traffic approaching the light, but not yet already within the intersection.
Moreover, even if the plaintiff had observed the defendant, she was entitled to assume that he would appropriately stop his vehicle. Correge, supra.
In summary, it appears that the trial judge did not determine that the defendant was already in the intersection at the time the plaintiff started from the green light. If so, such a determination is clearly wrong on the facts of this cause. The defendant not having entered the intersection, plaintiff did not owe him a duty to allow him to clear and she may therefore not be assessed with a degree of negligence in causing this accident. The determination of fault herein will be thus amended to show that the defendant Carroll was one hundred percent negligent in the cause of this accident.
DAMAGES
One of appellant’s complaints hereunder is that the trial court erroneously denied her full recovery for treatment of her fin *778 ger. Indeed, in a footnote to his Reasons for Judgment, the trial judge disallowed the hospital and other medical charges relating solely to the repair of appellant’s finger. The trial judge also disallowed recovery for the 28 days plaintiff was off work in connection with the hand surgery and follow-up recovery.
We cannot find that the trial judge was manifestly erroneous in disallowing recovery for these charges. The evidence revealed that appellant did not report any injury to her right ring finger until her first visit to Dr. Rambach seven months after the accident. The court found that this long period of delay in complaints of a finger injury cast serious doubt on the causation issue, and we cannot say that this finding was manifestly erroneous.
Also, the appellant vigorously complains that the trial court only awarded fifty percent of the cost of her second knee operation. Indeed, the trial court found that the plaintiff “was undoubtedly destined to have knee problems” because of her “preexisting knee disorders.” Thus, because the trial court determined that the accident exacerbated a preexisting condition, that only half the expenses of the second operation should be recoverable.
We agree with the appellant that the trial court erred in this respect. A tortfeasor takes the victim as he finds him and is thus fully responsible for the exacerbation of a preexisting condition. Thames v. Zerangue, 411 So.2d 17 (La.1982); Finley v. Bass, 478 So.2d 608 (La.App. 2d Cir.1985).
Therefore, the bills of the P & S Hospital, and Drs. Rambach, Nicholas, Prakasam and Hall, which were reduced in half, are recoverable in full. Likewise, the wages which plaintiff lost as a result of being off work due to the second knee operation are fully recoverable. Judgment will therefore be amended to increase the plaintiffs specials by the apparent amount to reflect full recovery for the aforesaid expenses.
Finally, the plaintiff also complains that the trial judge determined that she had preexisting high blood pressure and arthritis, and thus by implication complains of the trial court’s finding that these ailments were not caused by the wreck. She particularly complains that the trial judge’s determination in this regard was based on her testimony. We agree with the trial court that the record shows that the plaintiff eventually conceded on cross-examination that she indeed had taken medication for these ailments prior to the accident. Also, Dr. Hand stated that he believed the appellant suffered from arthritis as well as bursitis before the accident. This aspect is of little or no moment, however, as we have determined that the expenses for the second knee operation are entirely recoverable even if the accident only exacerbated an underlying condition. Further, there is no evidence of any special damages attributable to her preexisting high blood pressure.
We will therefore proceed to amend the judgment issued herein to reflect our decision that the plaintiff was free from fault and is entitled to recover all of the expenses attendant to the second knee operation. The trial court’s award of general damages was $89,000 and plaintiff should have judgment in that full sum. The trial court awarded special damages in the sum of $7,976.06 before halfing that amount to reflect the percentage of fault (50%) assessed to plaintiff. The judgment should be amended to reflect full recovery of those specials. The judgment should further be amended to add back into the special award the one-half of the cost of the second knee operation and the lost wages attendant thereto which were deleted to reflect the plaintiff’s preexisting condition. Half of the expenses and wages attributable to the second knee operation is $4,390.97. Therefore, the appropriate sum of plaintiff’s judgment should be $51,-367.03.
It is therefore ordered, adjudged and decreed that the portion of the judgment herein signed June 17, 1976, casting the defendants, Reginald L. Carroll and Bankers Multiple Line Insurance Company, in solido, in the sum of $23,488.03 is hereby amended to cast the defendants Reginald L. Carroll and Bankers Multiple Line Insurance Company, in solido, in the sum of *779 $51,367.03, together with legal interest from date of judicial demand and all costs of this litigation. The judgment is otherwise affirmed.
AMENDED and AS AMENDED, AFFIRMED.

. The trial judge described Dr. Rambach as "an orthopedic surgeon in Shreveport, who frequently is a medical witness for plaintiffs in damage suits in this Court.”

. LSA-R.S. 32:232 reads as follows:
§ 232. Traffic-control signals
Whenever traffic is controlled by traffic-control signals exhibiting different colored lights, or colored lighted arrows, successively one at a time or in combination, only the colors green, red and yellow shall be used, except for special pedestrian signals carrying a word legend, and said lights shall indicate and apply to drivers of vehicles and pedestrians as follows:
(1) GREEN indication:
(a) Vehicular traffic facing a circular green signal may proceed straight through or turn right or left unless a sign at such place prohibits either such turn. But vehicular traffic, including vehicles turning right or left, shall yield the right-of-way to other vehicles and to pedestrians lawfully within the intersection or an adjacent crosswalk at the time such signal is exhibited.
(b) Vehicular traffic facing a green arrow signal, shown alone or in combination with another indication, may cautiously enter the intersection only to make the movement indicated by such arrow, or such other movement as is permitted by other indications shown at the same time. Such vehicular traffic shall yield the right-of-way to pedestrians lawfully within an adjacent crosswalk and to other traffic lawfully using the intersection.
(c) Unless otherwise directed by a pedestrian control signal as provided in R.S. 32:233, pedestrians facing any green signal, except when the sole green signal is a turn arrow, may proceed across the roadway within any marked or unmarked crosswalk.
(2) Steady YELLOW indication:
(a) Vehicular traffic facing a steady yellow signal alone is thereby warned that the related green signal is being terminated or that a red signal will be exhibited immediately thereafter and such vehicular traffic shall not enter or be crossing the intersection when the red signal is exhibited.
(b) Unless otherwise directed by a pedestrian control signal as provided in R.S. 32:233 a pedestrian facing a steady yellow signal is thereby advised that there is insufficient time to cross the roadway before a red signal is exhibited and no pedestrians shall then start to cross the roadway.
(3) Steady RED indication:
(a) Vehicular traffic facing a steady circular red signal alone shall stop at a clearly marked stop line, or if none, then before entering the crosswalk on the near side of the intersection, or if none, then before entering the intersection, and shall remain standing until an indication to proceed is shown except as provided in Subparagraph (c) of this Paragraph.
(b) Vehicular traffic facing a steady red arrow signal shall not enter the intersection to make the movement indicated by the arrow and, unless entering the intersection to make a movement permitted by another signal, shall stop at a clearly marked stop line, or if none, then before entering the crosswalk on the near side of the intersection, or if none, then before entering the intersection, and shall remain standing until an indication permitting the movement indicated by such red arrow is shown except as provided in Subpar-agraph (c) of this Paragraph.
(c) Except when a sign prohibits a turn, vehicular traffic facing any steady red signal may cautiously enter the intersection to turn right, or to turn left from a one-way street into a one-way street, after stopping as required by Subparagraph (a) or Subparagraph (b) of this Paragraph. Such vehicular traffic shall yield the right-of-way to pedestrians lawfully within an adjacent crosswalk and to other traffic lawfully using the intersection.
(d) Unless otherwise directed by a pedestrian-control signal as provided in R.S. 32:233, a pedestrian facing a steady circular red or red arrow signal shall not enter the roadway.
(4) In the event an official traffic-control signal is erected and maintained at a place other than an intersection, the provisions of this Section shall be applicable except as to those provisions which by their nature can have no application. Any stop required shall be made at a sign or marking on the pavement indicating where the stop shall be made, but in the absence of any such sign or marking, the stop shall be made at the signal.

. In McMullan, this court found that McMullan, the driver approaching a green light which changed to yellow as he entered the intersection, was not negligent.
The case at bar is distinguishable from McMullan. In McMullan, the evidence revealed that the green light turned to yellow when the vehicle got to the pedestrian crosswalk. Moreover, the other vehicle in McMullan did not proceed from a stopped position through the green light, but instead entered the intersection while already traveling approximately 10-15 miles per hour when he entered the intersection immediately after the light changed from red to green. Finally, the physical damage in McMul-lan occurred only to the extreme right end of the front bumper, whereas in the instant case, Dale’s car was damaged as far back as the driver's door on the left side of her car.