641 So.2d 993 (1994)
Marilyn J. HORTON and Mary Horton, Plaintiffs-Appellants,
v.
STATE FARM INSURANCE COMPANY, Sarah Nelken, Eugene McDuff & Sarah Jerome, in solido, Defendants-Appellees.
No. 25943-CA.
Court of Appeal of Louisiana, Second Circuit.
August 17, 1994.
*994 Jack H. Kaplan, Shreveport, for plaintiffs-appellants.
Lunn, Irion, Johnson, Salley & Carlisle by Marshall R. Pearce, Shreveport, for defendants-appellees, Eugene McDuff, Sarah Jerome, & State Farm Mut. Auto Ins. Co.
Davis & Singleton by Dorothy F. Jackson, Shreveport, for third party defendant-appellee, La. Ins. Guaranty Assoc.
*995 Before MARVIN, C.J., and SEXTON and HIGHTOWER, JJ.
MARVIN, Chief Judge.
A plaintiff motorist, Marilyn Horton, who was found solely at fault in a Shreveport intersectional collision, appeals a $9,371 judgment on the reconventional demand made against her by State Farm, the subrogated insurer of the other driver, Sarah Jerome, for the amounts paid to Jerome for her personal injury and property damage.
Having paid Jerome a total of $19,371 (medical, UM personal injury, and property damage), State Farm initially reconvened for that amount against Horton. State Farm did not join either Horton's insolvent liability insurer, Colonial Lloyds, or the Louisiana Insurance Guaranty Association, that insurer's statutory successor under LRS 22:1375 et seq., in Horton's city court action. Horton joined LIGA as a third party defendant for the amount of any judgment against her on State Farm's reconventional demand.
State Farm thereafter supplemented its reconventional demand only against Horton. The supplement asserted that Horton's Colonial Lloyds liability policy had limits of $10,000/$20,000 and that if LIGA was not statutorily liable for the $19,371 subrogated claim asserted against Horton, Horton was liable to State Farm for $9,371, an amount "equal" to State Farm's demand, "less the $10,000 policy limits of the Colonial Lloyds policy." At the trial on the merits Horton's third party demand against LIGA was dismissed on the authority of LRS 22:1379(3)(b).
While primarily complaining of the city court's factual finding that she was solely at fault, Horton assigns three legal errors relating to
the city court's subject matter jurisdiction over State Farm's reconventional demand asserting claims exceeding $10,000;
the dismissal of Horton's third party demand against LIGA; and
 Horton being personally liable even for part of State Farm's subrogation claim.
Finding no error of fact or law, we affirm the judgment.

FACTS
The 1991 accident occurred during afternoon daylight hours at the intersection of Southern and Pierremont Avenues, each of which is a two-way, four-lane street, with two lanes in each direction. Traffic proceeds northerly and southerly on Southern and easterly and westerly on Pierremont. The intersection is controlled by traffic lights. The speed limit on each avenue is 35 mph.
Horton was driving west on Pierremont in a 1987 Chevrolet. Jerome had been driving south on Southern, intending to make a left turn onto Pierremont to proceed easterly in a 1988 Mazda. Near the center of the two westbound lanes of Pierremont, Horton's Chevrolet struck the front left or driver's side of Jerome's Mazda, which was later declared a total loss. Horton was ticketed for, and after trial was convicted of, running a red light. Horton instituted the action in city court to recover her damages against Jerome and her liability insurer, State Farm.
After hearing conflicting evidence about how the accident happened, which we hereafter summarize, the trial court found Horton solely at fault for running the red light. The court found that State Farm was subrogated to a $19,371.49 claim by virtue of its payments to its insured, Jerome, but reduced its recovery against Horton by $10,000, the amount of Horton's liability coverage purchased from Colonial Lloyds.
The trial court correctly applied § 1379(3)(b), which provides that an insured (here, Horton) of an insolvent insurer (here, Colonial Lloyds) shall not be liable for a subrogation claim within the insured's policy limits. Applying this credit ($10,000), the court cast Horton in judgment for $9,371.49 in favor of State Farm.

SUBJECT MATTER JURISDICTION
The city court's ruling that it had subject matter jurisdiction over the reconventional demand asserting claims exceeding $10,000 is clearly supported by CCP Art. 4845 A:
When a ... city court has subject matter jurisdiction over the principal demand, it may exercise subject matter jurisdiction *996 over any incidental action properly instituted in connection with the principal demand, regardless of the amount in dispute in the incidental demand.
 Our emphasis.
Horton contends Art. 4845 A is contrary to Art. 4843's grant of jurisdiction to city courts only in cases where the amount in dispute does not exceed $10,000.[1]
When a conflict exists in legislation on the same subject, the article that is more specifically directed to the matter at issue prevails over the more general article. Smith v. Cajun Insulation, Inc., 392 So.2d 398 (La.1980); Sargent v. La. Health Serv. & Indem. Co., 550 So.2d 843 (La.App. 2d Cir. 1989).
Art. 4843 provides that city courts have subject matter jurisdiction of a principal or main demand where the amount in dispute does not exceed $10,000. Subject matter jurisdiction of an incidental demand in city courts is not limited by a monetary amount. Art. 4845 A, emphasized and quoted above, grants subject matter jurisdiction to city courts over incidental demands, regardless of the amount in dispute, when the city court has subject matter jurisdiction over the principal demand.
The city court had subject matter jurisdiction over Horton's principal demand because she did not seek to recover more than $10,000 and over State Farm's incidental demand in reconvention, regardless of the amount in dispute in the incidental demand. Art. 4845 A.

DISMISSAL OF LIGA
State Farm did not name LIGA as a co-defendant with Horton in its reconventional demand. The trial court correctly dismissed Horton's third party demand against LIGA on the authority of LRS 22:1379(3)(b), which excludes from coverage by LIGA "any amount due any ... insurer ... as subrogation recoveries or otherwise."
Horton does not seriously dispute that LIGA statutorily has no liability on her third party demand. See § 1379(3)(b) and Townsend v. Clakley, 628 So.2d 1249 (La.App. 3d Cir.1993). She argues, however, that even if State Farm's subrogation claims are not covered by LIGA, LIGA yet had a duty to defend her on State Farm's reconventional demand because LIGA admits that Horton's Colonial Lloyds liability policy was in effect on the date of the accident. Horton cites cases which generally state that a liability carrier's duty to defend exists even where only one of several claims against the insured is a "covered" claim.
State Farm's claims against Horton were subrogation claims, specifically excluded from LIGA's statutory "coverage" by § 1379(3)(b). LIGA is statutorily deemed to have the rights, duties and obligations of the insolvent insurer only "to the extent of its obligation on the covered claims." § 1382 A(2); Bowens v. General Motors Corp., 608 So.2d 999 (La.1992). LIGA is not a conventional automobile liability insurer but a legislatively created entity designed to partially rectify the results of a licensed liability insurer becoming insolvent.
On this record, there is simply no support, factual or legal, for Horton's argument that LIGA owed her a duty to defend State Farm's reconventional demand which recognized the statutory $10,000 "credit" provided Horton because of the insolvency of Colonial Lloyds, Horton's liability carrier.

HORTON'S PERSONAL LIABILITY
Seeking to avoid personal liability altogether, even for the amount exceeding her $10,000 liability policy limit with Colonial Lloyds, Horton argues that if LIGA was properly dismissed because it does not statutorily "cover" subrogation claims, then State Farm should not be able to recover anything from Horton on those same claims.
Horton contends § 1379(3)(b), which on its face relieves the policyholder of liability on subrogation claims only to the extent of her policy limits, should be read with § 1376, stating that the purpose of LIGA is to protect *997 policyholders [and claimants] from the risk of an insurer's insolvency, and with § 1378, which mandates a liberal construction to effect the purpose of the LIGA legislation. Horton claims that when the three sections are read together, the statute shows that the legislature intended to relieve the policyholder of liability for "any subrogation claims whatsoever."
Again we cannot agree with Horton's contention because the law specifically provides to the contrary. When a statute is clear and free from ambiguity, its literal meaning may not be restricted or expanded under the pretext of pursuing its spirit. LRS 1:4; Rusher v. Winningham Nissan Volvo, Inc., 550 So.2d 784 (La.App. 2d Cir. 1989). We italicize and emphasize the statutory language that the legislature has used to state the liability of persons who find themselves in Horton's predicament:
"[A c]overed claim" [against LIGA] shall not include any amount due any ... insurer... as subrogation recoveries or otherwise. In addition, the insured of an insolvent insurer shall likewise not be liable for any subrogation claim asserted by any... insurer ... to the extent of the applicable liability limits previously provided to such insured by the insolvent insurer.

§ 1379(3)(b). Our brackets.
This section relieves LIGA of liability for all subrogation claims, especially those that fall within an insolvent insurer's policy limits, and "likewise" relieves the LIGA "insured" of liability for subrogation claims, but only "to the extent of his or her policy limits previously provided to such insured by the insolvent insurer."
When the subrogation claim does not exceed an insolvent liability insurer's policy limits, the subrogee cannot recoup its payments from either LIGA or LIGA's "insured." See, for example, Townsend v. Clakley, cited supra; Casualty Reciprocal Exchange v. Dukarie, 607 So.2d 834 (La.App. 1st Cir.1992), writ denied; and Henderson v. Pacific Marine Ins. Co., 611 So.2d 822 (La. App. 3d Cir.1992). In such circumstances the legislature has placed the burden of the liability insurer's insolvency on other solvent insurers and not on the insured policyholder.
If a subrogation claim exceeds the liability limits of an insured's liability policy, whatever the liability carrier's solvency may be, neither the liability policy nor the LIGA statutory scheme protects or provides coverage for the insured against his or her liability for the amount by which the claim exceeds the policy limits. In such a circumstance, the insured is solely cast in judgment for the excess amount, without regard to the solvency of his or her insurer. The insured's exposure to monetary loss in this respect is not determined by the solvency of his liability insurer, but by the amount of liability coverage the insured elects to purchase.
Horton's loss is not the type of loss that the LIGA statutes were intended to prevent or "cover." The trial court did not err in holding Horton liable for the amount of State Farm's claim that exceeded Horton's $10,000 liability policy limit for one person in one accident.

ALLOCATION OF FAULT
Horton and Jerome each claimed the traffic lights at the intersection favored her. Each presented a witness to corroborate her testimony.
Horton testified that as she approached the intersection, traveling in the northernmost or outside westbound lane of Pierremont Avenue, she faced a green light which turned yellow after she had entered and was crossing the intersection. She admitted, however, that she told the investigating police officer that the light was changing from yellow to red as she approached the intersection.
Horton was formally charged with running the red light. After a trial she was found guilty, having testified the light was yellow as she approached the intersection and changed to red as she crossed it. In the instant civil action, insisting she had the green light, Horton said she did not recall having given the prior inconsistent testimony, which was offered as impeachment evidence.
Horton said that while approaching the intersection on Pierremont Avenue, she saw *998 Jerome's vehicle at a "dead stop" at the traffic light, in the easternmost southbound lane of Southern Avenue. In this record, Horton simply claimed Jerome drove into the intersection in the face of a red light and Horton's car.
Jerome said she was in the inside southbound lane of Southern Avenue when she stopped at the intersection in response to a red light facing her, intending to turn left and proceed easterly on Pierremont. She explained that when the light turned green about 30 seconds later, she did not immediately begin her left turn but remained stopped for another five seconds or so to observe traffic on Pierremont. Jerome said she customarily followed this practice at that intersection because she traversed the intersection every day and was aware that drivers on Pierremont would often "run the red light."
Jerome said she observed that two westbound drivers on Pierremont were entering and crossing the intersection in the few seconds after Jerome's light turned green and as she remained stopped and began looking straight ahead for northbound traffic on Southern Avenue to see if she could safely begin her left turn. Jerome said she saw Horton's vehicle approaching the intersection from the same direction as the two cars that had crossed the intersection just as the light changed. Jerome said she thought or assumed Horton would stop for the light, which by that time, she reasoned, had been red in Horton's direction for at least several seconds. Seeing no northbound traffic on Southern, Jerome began her left turn and was struck by Horton near the center of the two westbound lanes of Pierremont.
Jerome's testimony was corroborated by Tim Collyer, yet another driver who had been headed west on Pierremont. Collyer had stopped in the inside or southernmost westbound lane of Pierremont in response to the red light facing him. He saw the two cars in the outside westbound lane of Pierremont enter the intersection on the yellow light and saw that Jerome had waited for these cars to clear the intersection before starting her left turn. Collyer said he saw, in his rearview mirror, Horton's car then approaching the intersection in the outside westbound lane of Pierremont, "going full blast like there was no light there." Collyer estimated that Horton was traveling 35 mph, the speed limit. According to Collyer, the light facing him and Horton had turned red before Horton reached and entered the intersection.
Horton's witness, Roosevelt Collins, had been driving northbound on Southern Avenue and had stopped for a red light at the intersection. He said he saw Jerome's vehicle, proceeding southbound on Southern, make a "rolling stop" at the intersection before she "drifted out into [Horton's] path." According to Collins, the light facing him was still red when Jerome entered the intersection, beginning her left turn. Collins said Horton had a green light. Collins did not recall seeing either the other westbound vehicles on Pierremont enter the intersection ahead of Horton or Collyer's car, which Collyer said was stopped on Pierremont. The trial court obviously accepted the testimony of Jerome and her witness over the testimony of Horton and her witness.
Horton argued at trial, and here, that she did not run the red light. She says that, in any event, Jerome should be found partially at fault for entering the intersection after having waited for two cars ahead of Horton's car to clear the intersection when the light changed and having seen Horton's vehicle approaching the intersection. Horton claimed it was unreasonable for Jerome to have simply assumed that Horton was going to stop under these circumstances.
The trial court ruled against Horton on both points, finding that she ran the red light and that Jerome did not act unreasonably or negligently in entering the intersection on a green light, after allowing the two cars that Horton followed to cross the intersection.
Horton continues to deny that she ran the red light but makes no attempt to articulate why the trial court was clearly wrong in resolving the conflicting testimony against her, other than to emphasize that there was some testimony in her favor. We are prohibited from reversing a factual finding when a trial court believes one of two *999 permissible views of conflicting evidence, as it did here. Rosell v. ESCO, 549 So.2d 840 (La.1989); Stobart v. State through DOTD, 617 So.2d 880 (La.1993).
Horton's primary assertion on appeal is that Jerome should have been found partially at fault because she could have avoided the accident by simply waiting for Horton to pass, just as Jerome had done for the two other westbound cars that entered the intersection ahead of Horton.
As a motorist favored with a green light, Jerome had a duty to allow vehicles already in the intersection when the light changed to traverse the intersection. Dale v. Carroll, 509 So.2d 770 (La.App. 2d Cir.1987). Jerome fulfilled this duty. The favored motorist's duty does not extend to looking down a cross street for traffic that is approaching but is not yet entering or within the intersection. Accepting the explanation by Jerome and Collyer of how and when Horton's vehicle entered the intersection after the other two vehicles, the trial court could make the permissible finding that Jerome was entitled to assume that Horton would stop for the red light. Dale, supra.
This record is devoid of any factual basis for assessing comparative fault to Jerome. See and compare Dale, supra; Christaw v. O'Bryant, 535 So.2d 1020 (La.App. 2d Cir. 1988), writ denied; and Cage v. Caruso, 611 So.2d 704 (La.App. 4th Cir.1992). See also the factually similar, albeit pre-comparative fault, case of Fireman's Insurance Co. of Newark, N.J. v. Green, 221 So.2d 843 (La. App. 3d Cir.1969).

DECREE
At Horton's cost, the judgment is AFFIRMED.
NOTES
[1] The jurisdictional limit of the Shreveport City Court has been increased to $15,000 by Acts 1993, No. 541, enacted after this suit was filed. We use the pre-1993 limit in our discussion.