KUHN, J.
This appeal arises out of a personal injury suit involving an automobile accident. We consider whether the trial court erred in assessing liability, whether an award of general damages was an abuse of discretion, and whether a stipulation addressing the maximum amount of recovery for individual petitioners was properly interpreted by the trial court. We amend the trial court’s judgment and, as amended, we affirm the judgment.
I. FACTS AND PROCEDURAL BACKGROUND
On November 18, 1993, plaintiff-appellee, Judith S. Hampton, was driving westbound on Goodwood Blvd. with her minor son, Jermaine Smith, as a passenger in her vehicle. Defendant-appellant, Michael Marino, was traveling eastbound on Goodwood Blvd. until he reached the intersection of Goodwood Blvd. and Airline Hwy. He then made a left-hand turn to the north from the eastbound lanes of Goodwood Blvd. onto Airline Hwy. As Hampton proceeded through the intersection, her vehicle was struck by Marino’s vehicle.
Judith S. Hampton filed suit on her own behalf and on behalf of Jermaine against defendants-appellants, Michael Marino and his insurer, Mid-Century Insurance Company (“Mid-Century”). State Farm Mutual Automobile Insurance Company (“State Farm”) intervened asserting subrogation rights and seeking to recover amounts paid for property damage and medical expenses pursuant to a policy providing coverage for the vehicle driven by Hampton.
After a bench trial, a judgment was signed awarding general and special damages totaling $41,985.84 in favor of Hampton, and general damages of $7,300.00 to Hampton, on behalf of Jermaine. Judgment was also awarded in favor of State Farm and against Marino and Mid-Century[1] for reimbursement of medical expenses and property damage expenses totaling $11,879.73.
bMarino and Mid-Century have appealed, asserting the trial court erred: 1) in assessing Marino with any fault in causing the accident and, alternatively, in failing to find Hampton was at least partially at fault in causing the accident; 2) in awarding $7,300.00 for general damages to Hampton on behalf of Jermaine; 3) in awarding in excess of $50,000.00 to Hampton when the parties had stipulated that “no individual petitioner’s cause of action exceeds $50,000.00, exclusive of costs and interest”; and 4) in awarding a judgment in favor of State Farm and against defendants because: a) Marino was not at fault and b) State Farm did not seek a judgment against Marino and Mid-Century. Alternatively, defendants urge the trial court erred in failing to reduce the awards by the percentage of fault attribut *506 able to Hampton, and in failing to limit State Farm’s recovery according to the terms of the stipulation that Hampton’s recovery be no greater than $50,000.00.
II. ANALYSIS
A. Liability
Conflicting testimony was presented during the trial regarding the operation of the traffic signal and regarding which motorist was favored with a green or yellow signal light at the time of the collision. Hampton testified that she and her son were headed to the library on Goodwood Blvd. at the time'of the accident. She stated that as she went through the Goodwood Blvd./Airline Hwy intersection, the light was green. She explained that because the light was green, she did not have to slow down or stop as she went through the intersection. She also testified she did not see anyone turning in front of her as she entered the intersection. As she reached the middle of the intersection, she saw Marino’s vehicle and tried to move to the right but was unable to avoid a collision. She testified that Marino told the police officer who investigated the accident that “he had a yellow arrow” when he went through the intersection.
Jermaine, who was twelve years old when the accident occurred, explained he and his mother were not in a rush to get to the library and were following a route they had taken many times before. Jermaine stated that before his mother’s car entered the intersection, he ^noticed the traffic signal was green. He did not see the light change at any time before the accident. He noticed Marino’s car a few seconds before impact and told his mother it was going to hit them. He explained that his mother took evasive action by swerving to the right before impact.
The defendants introduced the deposition testimony of Marino and of Richard Alan Sanders. Marino and Sanders, who were friends and classmates at the M.D. Anderson Cancer Center, testified that they were visiting Baton Rouge to attend a class at the Mary Bird Perkins Cancer Center. A group of people attending the class decided to eat together when the class was finished. Each person drove his own car, and the group formed a caravan procession which headed to a restaurant. Marino’s car was fourth in the caravan, and Sanders’ car was fifth. Both Marino and Sanders were unfamiliar with Baton Rouge. The drivers of the first three cars were from Baton Rouge. Marino and Sanders acknowledged they needed to keep up with the others in the caravan to find the restaurant.
Marino stated that as he approached the intersection, the light was red for travel in the turning lane. He explained the vehicles in front of him came to a complete stop for about three to four seconds before the light turned to a green arrow. The vehicles in front of him successfully made left turns. He testified he also made a complete stop before proceeding through the intersection. As he reached the middle of the intersection, the front of his car hit the driver’s side of Hampton’s car. Marino stated that to the best of his knowledge, the signal controlling his travel lane showed a green arrow when he entered the intersection. He stated he never saw a red signal while he was in the intersection. He recalled having made the same statement to the police officer who investigated the accident. However, Marino also testified that as he was in the middle of the intersection, he remembered the protective left-turn arrow changed to yellow. He described the intersection as “big,” and stated he was definitely inside the intersection when the light turned yellow.
Sanders testified that the ears in the caravan did not come to a stop at the Goodwood Blvd./Airline Hwy intersection because the green arrow left-turn signal had already been ^activated when the first car in the caravan reached the intersection. He stated the first car in the caravan made a “rolling stop,” and he did not recall any other cars in the left-turn lane in front of the five-car caravan. Sanders testified he did not come to a complete stop before reaching the intersection, but he did slow down as he went through the intersection. Sanders explained that the left-turn arrow signal was green the whole time he looked at it, and that he first noticed the signal from a distance of about five car lengths. Since he did not reduce his *507 speed below twenty-five miles per hour as he approached the intersection, he acknowledged that the green left-turn signal had been activated for some period of time before the first ear in the caravan reached the intersection.
Sanders stated as he drove towards the intersection, he had a green arrow, and that Marino’s car, which proceeded into the intersection ahead of him, entered while the arrow was green. Sanders testified that as he entered the intersection, the arrow was yellow. He explained that Marino’s car was approximately one-half way through the intersection at this.point. As Sanders passed under the light, he looked up and noticed it was yellow. When he looked back down, he saw Marino’s vehicle strike Hampton’s vehicle.
Timothy A. Cummings, a traffic engineer for the Department of Public Works, testified that the signal controlling the intersection in question was traffic responsive, meaning the timing and sequence of the light operated through detectors located in the roadway. He explained the signal had no fixed sequence, but varied its timing according to the traffic sensed by the detectors. He described the light as having a “conflict monitor,” a safeguard device which automatically causes the signal to flash in less than a second to prevent any conflicts in the traffic signals, such as the illumination of a signal protecting eastbound left-turn traffic travel-ling from Goodwood Blvd. onto Airline Hwy at the same time as the illumination of a green circular light for westbound through-traffic on Goodwood Blvd.[2]
kCummings explained the left-turn operation from Goodwood Blvd. onto Airline Hwy was protected when a green arrow was displayed. He testified that the period of time that the left-turn protected arrow remains displayed is variable, depending upon the amount of traffic in the left-turn lane. Once one car reaches a particular zone within the turning lane, the protected left-turn signal remains activated for a minimum of five seconds and can be extended as additional cars turning left travel through the turn lane, allowing a maximum left-turn signal of nineteen seconds. He explained that a wire, buried in the pavement and extending over a zone about fifty feet long, controls whether the protected left-turn arrow light remains activated for five seconds or longer. The signal light is extended beyond the five-second minimum actuation period in increments of seven-tenths of a second. Cummings stated the controller allows a gap in traffic of fifty feet, plus whatever distance the next car can travel in seven-tenths of a second. At any increment that the signal is not actuated, it then changes from the green arrow to the yellow arrow. When the protected eastbound green left-turn signal is terminated, it is followed by a yellow left-turn arrow for a duration of four seconds. The signal light for westbound traffic also remains red for an additional one-half second gap before changing to green.
Cummings testified that about five to six left-turning vehicles can travel through the intersection during the nineteen-second interval. He estimated that once the line of traffic starts moving, it takes an average of about two and one-half to three seconds for each vehicle to pass through the intersection. However, he also pointed out that traffic studies have shown that when drivers have stopped at an intersection controlled by a signal light, the first driver takes about four to five seconds to move once the light changes from red to green. The second driver reacts within three to four seconds, and gradually, the remaining drivers move through the intersection in about two and one-half to three seconds.
Excised portions of the accident report were introduced in lieu of the police officer’s testimony. The report states, in part:
Driver # 1 [Marino] advised he was following some other vehicles and the signal was a yellow arrow. And he pulled into the intersection and struck veh \¡#2 [Hampton’s vehicle] as he made his turn[.] Driver # 2 [Hampton] advised as she approached the intersection she had a green *508 light and continued across when veh # 1 [Marino’s vehicle] made a left turn and she tried to avoid it[J However[,] it struck her broadside[.]
After considering the evidence, the trial court found that Hampton had “preponderated in her claim and was free of any fault.”
On appeal, defendants urge that this court should not give the trial court’s factual findings regarding liability the usual deference under the manifest error or clearly wrong standard because the trial court did not explain the theory or the evidentiary facts upon which it based its determination. Defendants suggest that we conduct a de novo review of the record to determine the issue of liability. Alternatively, defendants argue that the trial court’s determination that Mar-ino was one hundred percent at fault is manifestly erroneous and that this court should reverse the finding of liability or assign at least fifty percent fault to Hampton.
In Bloxom v. Bloxom, 512 So.2d 839 (La.1987), the Louisiana Supreme Court addressed the appropriate standard of review applicable to issues raised on appeal in an automobile owner’s products liability action brought against an automobile manufacturer for alleged defects in an automobile. The Court held it was unable to give the trial court’s factual finding (that the exhaust system in the car was unreasonably dangerous to normal use) the usual deference attributed to the decisions of triers of fact because the trial court’s reasons did not articulate the theory or the evidentiary facts upon which its conclusion was based. The Court was unable to infer from the trial court’s reasons and the record, the theory under which the trial court found the product to be unreasonably dangerous to normal use. The Supreme Court stated:
Although we may accord deference to a decision of less than ideal clarity if the trial court’s path may reasonably be discerned, such as when its findings, reasons and exercise of discretion are necessarily and clearly implied by the record, we will not supply a finding from the evidence or a reasoned basis for the trial court’s decision that it has not found or that is not implied.
Bloxom v. Bloxom, 512 So.2d at 843.
bln contesting the trial court’s liability determination, defendants in this case have, in essence, sought review of the factual determinations made by the trial court regarding the credibility of the witnesses and regarding which motorist had the right of way to proceed through the intersection based on the operations of the traffic signal. Upon review of the record, we find that the “trial court’s path may reasonably be discerned.” The trial court implicitly accepted the testimony of Hampton and Jermaine and rejected the testimony of Marino and Sanders, finding that the circular signal controlling westbound traffic was green when Hampton proceeded through the intersection, and that Marino crossed the intersection after the protective left-turn arrow was no longer exhibited. Since the findings and reasons for the trial judge’s action can be necessarily implied by the record and sufficient evidence supports the trial court’s determination, the trial court’s factual findings are entitled to be reviewed under the manifest error standard. Jessen v. Dr. Kenneth W. Wimberly, D.D.S., 610 So.2d 252, 256 (La.App. 3d Cir.1992).
Louisiana Revised Statutes 32:232(l)(a), which addresses a green indication on a traffic-control signal, provides that “[vehicular traffic facing a circular green signal may proceed straight through or turn right or left,” but that such traffic “shall yield the right-of-way to other vehicles ... lawfully within the intersection ... at the time such signal is exhibited.” Vehicular traffic facing a green arrow signal may cautiously enter the intersection only to make the movement indicated by the arrow. La. R.S. 32:232(l)(b). Louisiana Revised Statutes 32:232(2)(a), addressing a steady yellow indication on a traffic-control signal, provides that “[vehicular traffic facing a steady yellow signal alone is thereby warned that the related green signal is being terminated or that a red signal will be exhibited immediately thereafter and such vehicular traffic shall not enter or be crossing the intersection when the red signal is exhibited.”
*509 A motorist approaching an intersection who is favored with a green light cannot depend exclusively on a favorable light but has a duty to watch for vehicles already in the intersection when the light changed. The favored motorist’s duty does not extend to looking fefor approaching traffic that has not yet entered the intersection. Horton v. State Farm Ins. Co., 25,943, p. 10 (La.App.2d Cir.8/17/94); 641 So.2d 993, 999.
A left turn is a dangerous maneuver and a driver has a duty not to attempt the turn until he ascertains it can be completed safely. A left-turning motorist is required to exercise a high degree of care, even where he executes his turn on the authority of an illuminated left turn signal. Once the plaintiff has established the defendant was attempting to make a left turn when the accident occurred, the burden of proof then shifts to the defendant to absolve himself/herself of liability. This burden remains despite the existence of a left turn signal at the intersection in question. The defendant may discharge this burden by proving that the left turn arrow was illuminated. Christaw v. O’Bryant, 535 So.2d 1020, 1022 (La.App. 2d Cir.1988); writ denied, 536 So.2d 1223 (La.1989).
In the present case, the parties do not dispute that Marino was making a left turn at the intersection. Hampton explained that the signal showed a circular green light as she drove toward the intersection. She did not see any vehicles as she approached the intersection and did not see Marino’s vehicle until immediately before the collision occurred. In finding no liability on Hampton’s part, the trial court implicitly accepted the testimony of Hampton and her son, and rejected the testimony that Marino entered the intersection while the left-turn arrow was actuated. Where two permissible views of the evidence exist, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Stobart v. State, Through Dept. of Transp. and Dev., 617 So.2d 880, 883 (La.1993).
The evidence supports a finding that Hampton was the favored motorist, and that she discharged her duty to yield to traffic already in the intersection as she approached it. Thus, we find a reasonable factual basis exists for the trial court’s findings and that its findings are not manifestly erroneous. We find no error in the trial court’s determination that Marino was one hundred percent at fault in causing the accident.
I10B. General Damages Awarded to Jermaine
Defendants urge the trial court abused its discretion in awarding $7,300.00 for general damages to Jermaine, asserting that Jermaine’s injuries were minor and had resolved in about two months. Defendants request that the award in favor of Hampton on behalf of Jermaine be reduced to an amount between $3,500.00 and $4,000.00.
During the accident, Jermaine hit his head on the top of the inside of the car. After-wards, his neck and thumb were swollen and a small bump developed on his head. Dr. Joseph Thomas, a pediatrician, examined Jermaine on November 22, 1996, four days after the accident. The examination revealed a slight local tenderness at the right side of the neck, where Jermaine complained of pain, a slight local tenderness over the right parietal area of the scalp, and a slight tenderness at the base of the left thumb. Dr. Thomas recommended rest for Jermaine and that he be rechecked as needed.
Jermaine returned to Dr. Thomas on December 10, 1993, complaining of continued stiffness and pain in the neck and upper back. Upon examination, Dr. Thomas found slight local tenderness in the upper back area. An x-ray examination of the cervical spine revealed the possibility of injury to the rotation mechanism of the neck. Dr. Thomas recommended the application of local moist heat. He advised Jermaine to rest and to refrain from physical education activities. Dr. Thomas also recommended that Jermaine be examined by an orthopedist. During a follow-up visit on January 17, 1994, Jermaine reported to Dr. Thomas that he was feeling fine and had been active. Dr. Thomas’ notes indicated that, upon his recommendation, Hampton had brought Jermaine to be examined by Dr. William F. Hagemann, an orthopedist, whose examination of Jermaine’s neck was unremarkable.
*510 Jermaine testified that after the accident, he had difficulty writing because his thumb bothered him, and he spent more time than usual at home due to his neck, back and head symptoms. He explained that he continued to have pain after his last doctor visit, and he avoided playing basketball with his friends due to this pain. He explained his injuries hadjngradually improved. Jermaine’s mother testified that Jermaine complained of neck pain and headaches for months after the accident.
We find the evidence in the record regarding Jermaine’s injuries and the pain jie has suffered as a result of the accident sufficient to support the general damages award. While we find the award of $7,500.00 to be generous, we do not find it constitutes an obvious abuse of discretion.
C. Stipulation of Maximum Recovery
Prior to trial, counsel for plaintiff, defendants and State Farm signed a stipulation which provided, in pertinent part, “... Plaintiffs, Defendants, and Intevenor [sic] ... stipulate that no individual petitioner’s cause of action exceeds $50,000.00, exclusive of costs and interest.”[3] At the beginning of the trial, the parties agreed that State Farm had paid $7,538.23 in property damages, $4,706.44 for Hampton’s medical expenses, and $549 .00 for Jermaine’s medical expenses. The following pertinent discussion took place between counsel at the beginning of the trial regarding the stipulation:
[Counsel for defendant]: [A]s part of the stipulation concerning damages, it is stipulated that if you find liability that Ms. Hampton is to reimburse State Farm $4,706.44 and $549.00 out of the $50,000. It’s not $50,000.00 plus, it’s $50,000—
[Counsel for plaintiff]: No, I think the 549 is part of the 50,000 on the child.
[Counsel for defendant]: Oh, yeah, sure. Yeah.
[Counsel for plaintiff]: All right. Okay.
No discussion took place regarding the property damages with respect to the stipulated maximum recovery of $50,000.00 for each individual petitioner.
The trial court awarded judgment in favor of Hampton and against Marino and Mid-Century, awarding general damages in the amount of $38,500.00, and $3,485.84 in special ^damages.[4] The trial court also awarded judgment in favor of State Farm and against defendants in the following amounts: $4,042.40 for medical expenses for Hampton,[5] $549.00 for medical expenses for Jermaine, and property damage in the amount of $7,288.33 (the stipulated amount of property damage less the applicable deductible).
On appeal, defendants complain the judgment provides recovery in excess of the maximum recovery allowed by the stipulation. Defendants contend that Hampton is the only petitioner in this suit and that the awards for general and special damages to Hampton, totaling $41,985.84; along with the awards of $7,288.33 for property damages and $4,042.40 for Hampton’s medical expenses awarded to State Farm exceed the $50,000.00 limitation agreed upon by counsel. We note defendants do not urge that Hampton’s combined recovery" on her own behalf and on behalf of her son is subject to the $50,000.00 limitation. Other than attacking the general damages award to Jermaine as being abusively high, defendants do not contest the $7,300.00 award on behalf of Jermaine.
Plaintiff asserts that no stipulation was made that the “property damage was to come out of Ms. Hampton’s $50,000.00 limit.” *511 Plaintiffs understanding was that the property damage would “come out of a separate property damage limit of the [Mid-Century] policy....”
We reject defendants’ argument that Hampton is the only petitioner in this suit. Since State Farm filed a petition of intervention asserting its claim for subrogation, we consider it to be a petitioner. The pertinent consideration is whether the recovery of Hampton and State Farm is based on the same cause of action or separate causes of action. If the recovery of State Farm and Hampton is based on individual causes of action, theyhwould each be entitled to recover up to $50,000.00 under the language of the stipulation. However, if they are co-owners of one cause of action, their joint recovery would be limited to $50,000.00.
Since State Farm’s insurance policy was not introduced into evidence, we cannot determine whether State Farm’s recovery, as intervenor, is based on a right of reimbursement or a right of conventional subrogation. While subrogation and reimbursement are similar in effect, they are different principles. With subrogation, the insurer stands in the shoes of the insured and acquires the right to assert the actions and rights of the plaintiff, whereas with reimbursement, the insurer has only a right of repayment against the insured. A true reimbursement provision does not allow the insurer to proceed against the tortfeasor. Barreca v. Cobb, 95-1651, p. 2-3, (La.2/28/96); 668 So.2d 1129, 1131. Subrogation is the substitution of one person to the rights of another. La. C.C. art. 1825. A subrogation may be total or partial. La. C.C.P. art. 697. Where the subrogation is partial, and the thing involved is a cause of action, co-ownership results. See Moody v. Arabie, 498 So.2d 1081, 1085 (La.1986); Nicholes v. St. Helena Parish Police Jury, 604 So.2d 1023, 1031 (La.App. 1st Cir.), writ denied, 605 So.2d 1378 (La.1992).
At the beginning of the trial in this matter, the parties stipulated to the amounts paid by State Farm. While discussing the stipulation regarding maximum recovery, counsel for defendants stated that the parties were stipulating that if defendants were liable, Hampton would reimburse State Farm fdr certain amounts. While further discussion ensued regarding the meaning of the stipulation, no one challenged that State Farm was entitled to reimbursement from Hampton for amounts already paid by State Farm. Since State Farm did not introduce its policy into evidence and we cannot determine whether it was entitled to “stand in the shoes of the insured” based on conventional subrogation, we find State Farm’s yrecovery is limited to reimbursement.[6] Under reimbursement principles, State Farm has only a right of repayment against Hampton and no right to recover directly from defendants.
Accordingly, Hampton is the only petitioner in this suit who has established she is entitled to recover from defendants. Her recovery is subject to the $50,000.00 limitation addressed in the stipulation. Since the record establishes the medical expenses and property damage incurred by Hampton, Hampton’s recovery should include an award for her medical expenses and her property damage, in addition to the general and special damages awarded to her. La. C.C.P. art. 2164.[7] When these awards are included, the total of all of the awards in Hampton’s favor would be in excess of $50,000.00. Since her total recovery is limited to $50,000.00, the trial court’s judgment is amended to provide that there be judgment in favor of Hampton and against Michael Marino and Mid-Century in the total amount of $50,000.00.
*512 Since the record also establishes Jermaine’s medical expenses, the award in favor of Hampton on behalf of Jermaine is amended to provide that Hampton is entitled to recover $7,300.00 for general damages and $549.00 for Jermaine’s medical expenses.[8]
In its supplemental petition of intervention, State Farm prayed that any damages recovered by the plaintiff and/or paid by defendants for property damage and for medical bills be apportioned in the judgment so that the claims of intervenor for property damages and medical expenses be paid in preference and priority to any claim paid to plaintiff. Based on this prayer and mindful that La. C.C.P. 2164 authorizes this court to render any ^judgment which is just, legal, and proper upon the record on appeal, we award reimbursement in favor of intervenor, State Farm, and against plaintiff, Judith S. Hampton, in the amounts of $4,042.40 for Hampton’s medical expenses, $549.00 for Jermaine’s medical expenses, and $7,288.33 for Hampton’s property damages.
III. CONCLUSION
For the above reasons, the judgment of the trial court is amended to provide for judgment: 1) in favor of plaintiff, Judith S. Hampton and against defendants, Michael Marino and Mid-Century Insurance Company in the amount of $50,000.00, plus legal interest from date of demand until paid; 2) in favor of plaintiff, Judith S. Hampton, on behalf of the minor child, Jermaine M. Smith, and against defendants, Michael Marino and Mid-Century Insurance Company, in the amount of $7,300.00 for general damages and $549.00 for medical expenses, plus legal interest from date of demand until paid; and 3) in favor of intervenor, State Farm Mutual Automobile Insurance Company, and against plaintiff, Judith S. Hampton, in the amounts of $4,024.40 for medical expenses paid on her own behalf, $549.00 for medical expenses paid on Jermaine Smith’s behalf, and $7,288.33 for property damages. The costs of this appeal are to be paid by defendants-appellants, Michael Marino and Mid-Century Insurance Company.
JUDGMENT AMENDED AND, AS AMENDED, AFFIRMED.

. The judgment incorrectly identifies "Mid-Century” as "Mid-Centry.”

. Cummings also testified that the maintenance records did not indicate any problems with the signal light around the time of the accident. Earlier problems involving the signal light had not been related to the eastbound left-turn operations.

.La.Code of Civil Procedure article 1732(1) provides that there shall be no trial by jury “in a suit where the amount of no individual petitioner’s cause of action exceeds fifty thousand dollars exclusive of interest and costs.” In this matter, defendants requested a trial by jury in the event that it was “shown that the injuries sustained by [Hampton] and [Jermaine] are sufficient to entitle them to damages in an amount sufficient to support a jury trial .... ” The parties entered into the stipulation at issue, and the matter was decided by a bench trial.

. The special damages award is comprised of $2,435.84 for wage loss, $800.00 for car rental expense and $250.00 for reimbursement of the insurance deductible for property damages.

. The record does not clarify why the trial court awarded a different amount for medical expenses for Hampton than that amount which was stipulated by the parties.

. Based on the facts of this case, State Farm does not become legally subrogated to the rights of Hampton simply by making payments to Hampton because it is not bound with Marino or liable for Marino's actions.' La. C.C. art. 1829(3); A. Copeland Enterprises, Inc. v. Slidell Memorial Hosp., 94-2011 (La.6/30/95); 657 So.2d 1292. Because State Farm alleged entitlement to reimbursement in its petition of intervention and since the parties do not dispute State Farm’s right to recovery for property damages and medical bills paid on behalf of Hampton, based on the evidence in this record, we treat State Farm’s recovery as one pursuant to a right of reimbursement.

. Louisiana Code of Civil Procedure article 2164 provides, in pertinent part: "The appellate court shall render any judgment which is just, legal, and proper upon the record on appeal.”

. We again note that defendants do not urge that Hampton's combined recovery on her own behalf and on behalf of her son is subject to the $50,000.00 limitation.